IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FINANCIAL TECHNOLOGY
ASSOCIATION

1602 Belle View Blvd. #4075
Alexandria, VA 22307

        Plaintiff,

    v.

CONSUMER FINANCIAL PROTECTION
BUREAU, and ROHIT CHOPRA, in his
official capacity as Director of the Consumer
Financial Protection Bureau,

1700 G Street N.W.
Washington, DC 20552

        Defendants.

Civil Action No.  1:24-cv-2966

# COMPLAINT

1.      The Financial Technology Association ("FTA") champions the power of

technology-centered financial services and advocates for the modernization of financial

regulation to support inclusion and responsible innovation.  FTA believes that the CFPB serves

an important role in achieving those goals and it embraces the CFPB's mission to protect

consumers and empower them to make informed financial decisions.  For these reasons, FTA

supports the CFPB's stated purpose in issuing its new rule addressing "buy now, pay later"

("BNPL") products payable in four or fewer installments:[1] providing consumers disclosures that

---

[1] Truth in Lending (Regulation Z); Use of Digital User Accounts to Access Buy Now, Pay Later
Loans, 89 Fed. Reg. 47,068 (May 31, 2024) (hereinafter, "New Rule").

promote the informed use of credit and offering consumers protections against inaccurate and unfair billing practices.

2.      At the same time, however, FTA believes that the CFPB must operate within the bounds of the law.  The CFPB wields "vast authority," *Seila Law LLC v. CFPB*, 591 U.S. 197, 236 (2020), that affects financial services providers and consumers in significant ways.  This makes it all the more important that, when the CFPB imposes new obligations, it adheres to the procedural and substantive requirements the Administrative Procedure Act ("APA") mandates for such actions.  Hewing to those requirements not only preserves the rule of law, it facilitates sound policymaking.  Unfortunately, the New Rule violates these requirements in several ways.

3.      ***First***, the New Rule violates the APA's notice-and-comment requirements. Agency action must be set aside when it is done "without observance of procedure required by law."  5 U.S.C. § 706(2)(D).  That is the case here.  Both bedrock administrative law principles and the statute the CFPB says gives it the authority to promulgate the New Rule—the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq.*—required the CFPB to promulgate the New Rule through notice and comment.  But the CFPB skipped that requirement by slapping the "interpretive rule" label onto the New Rule while purporting to spring new legal obligations on BNPL providers.  That is unlawful.

4.      ***Second***, the New Rule violates the APA's requirements that agencies act within the statutory authority Congress has granted them.  The APA makes it unlawful to issue rules that are "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).  The New Rule exceeds the CFPB's statutory authority in two ways: by setting an effective date that contravenes the TILA's effective-date requirement for new

disclosure requirements, *see* 15 U.S.C. § 1604(d), and by purporting to impose obligations beyond those permitted by TILA, *see* 15 U.S.C. § 1602(g).

5.      ***Third***, the New Rule is arbitrary and capricious and an abuse of discretion. 5 U.S.C. § 706(2)(A).  The New Rule is arbitrary and capricious because the CFPB overlooked that certain obligations the New Rule purports to impose are a poor fit for BNPL products; overlooked that the New Rule grants insufficient time for BNPL providers to come into compliance with the new obligations the New Rule purports to impose; and neglected the serious reliance interests that its prior policy on BNPL products engendered.  The New Rule is also an abuse of discretion because it is based on an improper understanding of the law.

## JURISDICTION AND VENUE

6.      This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this case arises under the laws of the United States.

7.      Venue is proper in this district under 28 U.S.C. § 1391(e)(1) because Defendants CFPB and Director Rohit Chopra reside here.

## PARTIES

8.      FTA is a trade organization that represents the interests of the financial technology industry.  FTA promotes the adoption and understanding of innovative financial technologies; advocates for a modern regulatory framework that supports innovation and consumer protection; and provides a platform for collaboration and discussion among industry stakeholders, policymakers, and consumers.

9.      FTA's members include financial technology companies that provide consumers access to BNPL loans that are subject to the New Rule.  *See* FTA Member Companies, https://www.ftassociation.org/members/ (accessed October 13, 2024).  Some of those members

provide BNPL loans directly to consumers and others provide the platform for consumers to obtain such loans from third-party financial institutions.

10.     FTA and several of FTA's members submitted comments to the CFPB before the New Rule's applicability date.  *See* Comments on *Truth in Lending (Regulation Z): Use of Digital User Accounts to Access Buy Now, Pay Later Loans*, REGULATIONS.GOV, https://www.regulations.gov/document/CFPB-2024-0017-0001/comment.

11.     FTA brings this suit on behalf of its members who provide BNPL loans, either directly or on behalf of other institutions, and who have been forced to determine what their compliance obligations may be now that the New Rule purports to amend Regulation Z and its Official Commentary and impose new disclosure and other obligations on BNPL providers.

12.     Prior to the issuance of the New Rule, FTA's members could rely on a safe harbor from private liability provided by 15 U.S.C. § 1640(f) for their good faith compliance with Regulation Z and its Official Commentary.  The New Rule purports to eliminate that safe harbor and substitute in its place a new safe harbor, but only if BNPL providers comply with the poorly described compliance obligations it would impose.  As a result, without judicial intervention, FTA's members will be forced to either comply with the New Rule or accept increased risk of private litigation caused by the New Rule's unlawful attempt to eliminate the existing safe harbor.

13.     Defendant CFPB is an agency of the United States.  12 U.S.C. § 5491(a).

14.     Defendant Chopra is the Director of the CFPB.  Director Chopra is sued in his official capacity.

**STATUTORY BACKGROUND: THE TRUTH IN LENDING ACT AND "CREDITORS"**

15.     Enacted in 1968, TILA seeks to facilitate the "informed use of credit" by consumers.  Pub. L. No. 90-321, § 102, 82 Stat. 146 (1968).  It does so by mandating the "meaningful disclosure of credit terms so that … consumer[s] will be able to compare more readily the various credit terms available to [them]."  *Id.*; *see also* 15 U.S.C. § 1601(a).

16.     To achieve these goals, TILA imposes certain obligations on "creditors."  TILA defines "creditors" in several ways.  The primary definition—not at issue here—encompasses any person that extends credit "payable by agreement in more than four installments" or that requires payment of a "finance charge."  15 U.S.C. § 1602(g).  This definition thus embraces issuers of a variety of credit products—for example, mortgage loans and traditional credit cards—that impose a finance charge, are payable in more than four installments, or both.  TILA imposes on these creditors a suite of disclosure obligations and substantive requirements.

17.     A secondary definition of "creditor" embraces a different (and more specific) type of creditor: certain "card issuers."  15 U.S.C. § 1602(g).  It is this secondary definition that is relevant here.  A "card issuer" is someone "who issues a credit card," and a "credit card" is "any card, plate, coupon book or other credit device existing for the purpose of obtaining money, property, labor, or services on credit."  15 U.S.C. § 1602(o), (*l*).  When Congress amended TILA to define these terms, it had in mind a subset of those who issue credit—specifically, the issuers of physical objects, such as embossed, plastic credit cards similar in appearance to today's credit cards that could be used to purchase a variety of goods and services.  *See* Pub. L. No. 91-508, § 501, 84 Stat. 1114 (1970).  Indeed, the primary concern motivating that amendment was the mass mailing of unsolicited credit cards by issuing banks.  *See generally* John C. Weistart, *Consumer Protection in the Credit Card Industry: Federal Legislative Controls*, 70 Mich. L. Rev. 1475, 1483-85 (1972).

18.     This secondary definition of "creditor" subjects to certain provisions of TILA a subset of "card issuers" who would not otherwise be subject to the Act: those who do *not* impose a finance charge or seek repayment in more than four installments.  15 U.S.C. § 1602(g) ("For the purpose of the requirements imposed under part D of this subchapter and sections 1637(a)(5), 1637(a)(6), 1637(a)(7), 1637(b)(1), 1637(b)(2), 1637(b)(3), 1637(b)(8), and 1637(b)(10) of this title, the term 'creditor' shall also include card issuers whether or not the amount due is payable by agreement in more than four installments or the payment of a finance charge is or may be required, and the Bureau shall, by regulation, apply these requirements to such card issuers, to the extent appropriate, even though the requirements are by their terms applicable only to creditors offering open-end credit plans.").

19.     This secondary definition of "creditor" was added by Congress through amendments to TILA by enacting the Fair Credit Billing Act.  *See* Fair Credit Billing Act, Pub. L. No. 93-495, § 303, 88 Stat. 1500 (1974) (codified as amended at 15 U.S.C. § 1602(g)). Congress' intent behind this secondary definition was "to bring under coverage of the truth-in-lending law, the issuers of travel and entertainment cards such as American Express, Diners Club, and so forth."  118 Cong. Rec. S6882, S6892 (daily ed. Apr. 27, 1972).  Congress did so in response to concerns that the primary definition of "creditor" would exclude "issuers of travel and entertainment cards," from TILA's requirements, because those cards expected repayment at the first billing and did not impose a finance charge, thereby falling outside the primary definition of creditors described above.  *Fair Credit Billing Act: Hearings on S. 652 Before the Subcomm. on Fin. Insts. of the S. Comm. on Banking, Hous. & Urb. Affs.*, 92nd Cong. 19 (1971). This secondary definition thus covers the issuers of travel and entertainment cards.

20.     As to the subset of creditors covered by the secondary definition, TILA authorizes the agency tasked with implementing TILA—originally the Federal Reserve Board of Governors ("FRB"), but today the CFPB, *see* 12 U.S.C. § 5581(b)(1)—to extend a limited subset of TILA's requirements to those "card issuers" but only if it proceeds "by regulation" after a determination that those requirements are "appropriate."  15 U.S.C. § 1602(g).  That language thus conveys that only some of TILA's requirements applicable to creditors under the primary definition may be extended to only certain types of "card issuers," only "by regulation," and only when it makes sense to do so.

21.     Examples of the requirements that Congress determined may be imposed on these creditors include a provision that requires disclosure, at account opening, of "other charges" (i.e., not included in the "finance charge") that can be imposed by the card issuer, 15 U.S.C. § 1637(a)(5); a provision that requires the disclosure, at account opening, of any security interest that will be taken as part of the credit transaction, *id.* § 1637(a)(6); a provision requiring a description, in periodic statements, of "each extension of credit" during the billing period, including the amount and date of each extension of credit, *id.* § 1637(b)(2); provisions requiring card issuers to correct billing errors, *id*. § 1666; and provisions allowing cardholders to assert claims and defenses available with respect to a transaction against the card issuer in certain limited circumstances, *id.* § 1666i.

**REGULATORY BACKGROUND: SUBPART B OF REGULATION Z**

22.     In 1975, the FRB promulgated regulations to implement the amendments made to TILA by the FCBA.  40 Fed. Reg. 43,200, 43,202 (Sept. 19, 1975).  As relevant here, the FRB took up the task of determining how TILA should apply to those card issuers offering credit products without a finance charge that are payable in four or fewer installments—namely, the

travel and entertainment cards that drove Congress to expand the definition of creditor via the secondary definition described above.

23.     In line with TILA's limitations on which requirements may be extended to such creditors, the FRB extended a *limited subset* of TILA's requirements "by regulation … to the extent appropriate," 15 U.S.C. § 1602(g), to those creditors.  The FRB did this through what is known as Subpart B of Regulation Z.  The obligations deemed "appropriate" ranged from the date of each transaction and a brief description, 12 C.F.R. § 226.7(b)(1)(ii) (1975) (corresponding to TILA § 127(b)(2) (1975)), to the conditions under which the creditor may retain or acquire any security interest, 12 C.F.R. § 226.7(a)(7) (1975) (corresponding to TILA § 127(a)(7) (1975)).  *See* 12 C.F.R. § 226.2(s) (1976) ("For purposes of the requirements of §§ 226.7(a) (6), (7), (8), and (9); 226.7(b) (1) (i), (ii), (iii), (ix), and (x); 226.7(b)(2); 226.7 (c), (d), (f), (g), (h), and (i); 226.13; and 226.14, the term 'creditor' shall also include card issuers, whether or not the payment of a finance charge is or may be required.").

24.     A few years later, in the wake of the TILA Simplification Act, the FRB amended Regulation Z and adopted the regulatory definition of "creditor" that exists to this day: "'Creditor' means … [f]or purposes of Subpart B, any card issuer that extends either open-end credit or credit that is not subject to a finance charge and is not payable by written agreement in more than 4 installments."  46 Fed. Reg. 20,848, 20,893 (Apr. 7, 1981); *see also* 12 C.F.R. § 1026.2(17)(iii) (setting forth same definition).  In doing so, the FRB noted that it did not intend to impose a "substantive difference in coverage" between the revised version and the original regulation that implemented the FCBA.  46 Fed. Reg. at 20,852.

25.     The CFPB later inherited most of the FRB's authority to implement TILA, including the provisions relevant here.  *See* 12 U.S.C. § 5581(b)(1).  After this transfer of

authority, the CFPB reissued Regulation Z "without impos[ing] any new substantive obligations." *See* Truth in Lending (Regulation Z), 76 Fed. Reg. 79,768, 79,771 (Dec. 22, 2011).

### REGULATORY BACKGROUND: THE OFFICIAL STAFF COMMENTARY

26.     The CFPB's Official Staff Commentary, issued through notice and comment, is the CFPB's "official interpretation of Regulation Z." *Gilliam, Tr. of Lou Easter Ross Revocable Tr. v. Levine, Tr. of Joel Sherman Revocable Tr.*, 955 F.3d 1117, 1121 (9th Cir. 2020); 12 C.F.R. pt. 1026; Supplement I, Introduction comments 1 & 2 (noting that "[n]o official interpretations are expected to be issued other than by means of this commentary").

27.     The Official Commentary has never understood Regulation Z to apply to BNPL products. To the contrary, two aspects of the Official Commentary foreclose the notion that BNPL products are subject to Regulation Z.

28.     To start, under the Official Commentary, the only "card issuers" subject to TILA despite not imposing a finance charge or requiring repayment in more than four installments are "the issuers of so-called travel and entertainment cards that expect repayment at the first billing and do not impose a finance charge." 12 C.F.R. pt. 1026, cmt. 2(a)(17)(iii)-1. In other words, the Official Commentary tracks the legislative history showing that Congress had in mind travel and entertainment cards when it expanded TILA's definition of creditor via its secondary definition of that term and adopts that understanding as its definition of which "card issuers" not imposing a finance charge or requiring repayment in more than four installments are subject to TILA. *See supra* 6-7. The BNPL products FTA's members offer are not travel or entertainment cards.

29.     In addition, the Official Commentary generally rejects the notion that an "account number" divorced from a physical card can nonetheless constitute a "credit card" under TILA.

The Official Commentary concludes that only certain "account numbers that [can] access a credit account [are] credit cards for purposes of TILA": those that "can access an *open-end line of credit* to purchase goods or services."  Truth in Lending, 76 Fed. Reg. 22,948, 22,949, 23,005 (Apr. 25, 2011) (emphasis added).  That conclusion is codified in Regulation Z.  12 C.F.R. pt. 1026, cmt. 2(a)(15)-2(ii)(C).  FTA represents members who offer BNPL products, and BNPL products are not open-end lines of credit, as the CFPB itself recognizes, Truth in Lending (Regulation Z), 89 Fed. Reg. at 47,069.

30.     Because the CFPB's Official Commentary is the CFPB's official word on what its regulations mean, those who rely on the Official Commentary in good faith are entitled to a safe harbor from liability for any act or omission done in conformity with it.  15 U.S.C. § 1640(f).  By issuing the New Rule, however, the CFPB seeks to eliminate that existing regulatory safe harbor, substituting in its place a safe harbor for only those who conform to the interpretation of the New Rule.  Truth in Lending (Regulation Z), 89 Fed. Reg. at 47,072.  Thus, the New Rule would impose "legal consequences," if it were valid, on FTA's members who offer BNPL products subject to the New Rule.  *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 599 (2016).

**THE CFPB'S PAST PUBLIC STATEMENTS**

31.     Not only do the statute, regulations, and Official Commentary make clear that BNPL products have never been understood to fall under Regulation Z's requirements, the CFPB's public statements likewise have only ever suggested that BNPL products are not "credit cards" subject to those requirements.  In fact, the CFPB has consistently described BNPL products as distinct from credit cards.  It has called BNPL loans an "alternative to credit cards," noted "key differences between BNPL loans and credit cards," and has said that BNPL loans are

not subject to the consumer protections applicable to credit cards.[2]  And even while recognizing

that most BNPL providers do not comply with Regulation Z's provisions governing card issuers,

the CFPB had never suggested that BNPL providers must comply with them until the issuance of

the New Rule.[3]

## THE NEW RULE

32.     In May 2024, the CFPB published the New Rule and announced that it is

applicable as of July 30, 2024.  Truth in Lending (Regulation Z), 89 Fed. Reg. at 47,070.

33.     The New Rule breaks from the CFPB's longstanding view that those who provide

BNPL products are not "creditors" subject to subpart B of Regulation Z because they are not

"card issuers."  The New Rule, under the moniker of a so-called "interpretive rule," departs from

the Official Commentary's understanding and now maintains that BNPL products *are* subject to

subpart B of Regulation Z because "lenders that issue BNPL digital user accounts are 'card

issuers' under Regulation Z because the digital user accounts they issue constitute 'credit cards'

under Regulation Z."  *Id.* at 47,070.

34.     The CFPB reaches this new conclusion by claiming that the term "other credit

device" contained in TILA's definition of "credit card," 15 U.S.C. § 1602(l), "encompasses

_____

[2] *See* CFPB, *The Consumer Credit Card Market* at 165 (Sept. 2021),
https://files.consumerfinance.gov/f/documents/cfpb_consumer-credit-card-market-
report_2021.pdf; Andrew Braden, *Know before you buy (now, pay later) this holiday season*
(Dec. 16, 2021), https://www.consumerfinance.gov/about-us/blog/know-before-you-buy-now-
pay-later-this-holiday-season/; CFPB, *The Convergence of Payments and Commerce:
Implications for Consumers* at 12 (Aug. 2022),
https://files.consumerfinance.gov/f/documents/cfpb_convergence-payments-commerce-
implications-consumers_report_2022-08.pdf.

[3] *See* CFPB, *Buy Now, Pay Later: Market trends and consumer impacts* at 72-73 (Sept. 2022),
https://files.consumerfinance.gov/f/documents/cfpb_buy-now-pay-later-market-trends-
consumerimpacts_report_2022-09.pdf ("[M]ost BNPL lenders do not currently provide the
standard cost-of-credit disclosures required by Regulation Z or periodic statements.").

digital user accounts that consumers can use through websites, mobile apps, browser extensions, or integrations with merchant websites or mobile apps to access BNPL credit for the purchase of goods and services." 89 Fed. Reg. at 47,070. Because BNPL providers offer those "other credit device[s]," says the CFPB, they are "creditors" and subject to subpart B of Regulation Z, "including those provisions governing cost of credit disclosures and billing disputes." *Id.*

35.    On August 16, 2024, the CFPB's Director published a blog post acknowledging that the New Rule would require a "transition" for BNPL providers and pledged not to seek penalties against companies who are "transitioning into compliance" with the new regulatory obligations the New Rule purports to impose. The blog post also stated that the CFPB would issue a set of Frequently Asked Questions ("FAQs") "to help lenders make transitions" to the new regulatory regime the New Rule purported to impose.[4]

36.    The CFPB issued the FAQs on September 18, 2024, but the FAQs did not address comments raising concerns with the legality of the New Rule, including the CFPB's failure to follow notice-and-comment rulemaking processes. Likewise, the FAQs did not address the inconsistency of the New Rule with Regulation Z's existing Official Commentary.[5]

37.    Finally, while the FAQs purported to extend the scope of the New Rule by adopting a broad interpretation of the New Rule's undefined term "digital user account," a term that is not grounded in statutory or regulatory text, the FAQs did not acknowledge that, as a compliance aid, they cannot represent an official interpretation of the agency. *See* Policy

---

[4] *See* Rohit Chopra, *What Buy Now, Pay Later lenders are doing to be upfront with borrowers* (Aug. 16, 2024), https://www.consumerfinance.gov/about-us/blog/what-buy-now-pay-later-lenders-are-doing-to-be-upfront-with-borrowers/.

[5] *See* CFPB, *Buy Now, Pay Later Product FAQs* (Sept. 2024), https://www.consumerfinance.gov/compliance/compliance-resources/consumer-cards-resources/buy-now-pay-later-bnpl-products/buy-now-pay-later-product-faqs/.

Statement on Compliance Aids, 85 Fed. Reg. 4579, 4579 (Jan. 27, 2020) ("Unlike the Bureau's regulations and official interpretations, Compliance Aids are not 'rules' under the Administrative Procedure Act.").

## THE NEW RULE MUST BE SET ASIDE BECAUSE IT SUFFERS FROM MULTIPLE LEGAL DEFECTS UNDER THE APA AND TILA

38.     The New Rule must be vacated because it suffers from multiple fatal legal defects.  It violates procedural requirements mandated by the APA and TILA; it defies the statutory constraints that TILA imposes on the CFPB's actions in this sphere; and it is arbitrary and capricious, and an abuse of discretion.  5 U.S.C. § 706(2) (A), (C), (D).

### *The New Rule Is Unlawful Because It Did Not Go Through Notice And Comment*

39.     The New Rule must be set aside because it was issued "without observance of procedure required by law."  5 U.S.C. § 706(2)(D).  Both bedrock administrative law principles and TILA itself required the CFPB to promulgate the New Rule through notice and comment.  But the New Rule flouts these requirements.

40.     ***The APA Mandates Notice And Comment***.  First, it is bedrock administrative law that agencies must "use the same procedures when they amend … a rule as they used to issue the rule in the first instance."  *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 101 (2015) (interpreting 5 U.S.C. § 553).  The New Rule disregards this requirement by seeking to amend through an "interpretive rule" the Official Commentary, which was promulgated through notice and comment.  12 C.F.R. pt. 1026; Supplement I, Introduction comments 1 & 2.

41.     As explained above (at 9-12), the New Rule amends the Official Commentary by expanding the definition of who is subject to Regulation Z.  The Official Commentary states that

those "card issuers" who are considered "creditors" because they issue closed-end credit not subject to a finance charge or payable in more than four installments are those "issuers of so-called travel and entertainment cards that expect repayment at the first billing and do not impose a finance charge." 12 C.F.R. pt. 1026 Cmt. 2(a)(17)(iii)-1. The Commentary also provides that "an account number that accesses a credit account" will only be considered a "credit card" if "the account number can access *an open-end line of credit to purchase goods or services*." 12 C.F.R. pt. 1026, cmt. 2(a)(15)-2.ii.C (emphasis added). The Official Commentary thus defines as "card issuers" only those who issue "closed-end" credit through physical travel and entertainment cards or those who issue "open-end" credit through physical cards or an account number.

42. The New Rule purports to revise those definitions. It embraces the notion that "BNPL digital account numbers" are "credit cards" even though they are not physical cards and can only be used to access closed-end credit. *See* Truth in Lending (Regulation Z), 89 Fed. Reg. at 47,071 n. 27 (defining BNPL credit "as a closed-end consumer loan for a retail transaction that is repaid in four (or fewer) interest-free installments and does not otherwise impose a finance charge"). Because the New Rule effectively amends the Official Commentary, which was promulgated through notice and comment, to now embrace a product that would have been excluded from the CFPB's old definition of a credit card, the CFPB violated the APA's requirement to "use the same procedures" to amend the "rule as [it] used to issue the rule in the first instance." *Perez*, 575 U.S. at 101. The New Rule must therefore be vacated. 5 U.S.C. § 706(2)(D).

43. ***TILA Mandates Notice And Comment***. Second, the New Rule violates TILA's requirement that the CFPB proceed through notice-and-comment rulemaking before extending obligations to card issuers who do not impose a finance charge or require repayment in more

than four installments.  Although TILA contemplates that those card issuers may be subject to a subset of TILA's provisions, it only contemplates that these "card issuers" may be subject to those provisions, "to the extent appropriate," and even then, only if the CFPB proceeds to extend those provisions to card issuers "*by regulation*."  15 U.S.C. § 1602(g) (emphasis added).

44.     When TILA says "by regulation" it means just that: a legislative rule, not a non-binding interpretation.  Indeed, TILA often distinguishes between "regulations" and "interpretations."  Examples abound.

45.     Take, for instance, TILA's grant of discretion to the CFPB on "lengthen[ing] the period of time permitted for creditors or lessors to adjust their forms to accommodate new requirements."  15 U.S.C. § 1604(d).  TILA specifies that the CFPB may lengthen that period by taking "interim action by *regulation*, amendment, or *interpretation*."  *Id.* (emphasis added).  Or take TILA's safe-harbor provision.  That provision immunizes from liability good-faith actions done "in conformity with any rule, *regulation*, or *interpretation* … by the Bureau."  15 U.S.C. § 1640(f) (emphasis added).

46.     By distinguishing between "regulation[s]" and "interpretation[s]," TILA makes clear that a regulation is not the same thing as an interpretive rule.  A. Scalia & B. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 170-171 (2012) (noting that, in statutory interpretation, the same term in a statute carries the same meaning, and a different term carries a different meaning).  As a result, when TILA contemplates extending certain obligations "by regulation" to card issuers that do not impose a finance charge or require repayment in more than four installments, that means it must be done through notice and comment rulemaking.

47.     There is no dispute that the CFPB did not go through notice and comment.  Before it even proposes a rule, the CFPB must comply with the Small Business Regulatory

Enforcement Fairness Act, which requires it to convene a Small Business Review Panel so that it can consult with representatives of small entities likely to be affected by regulations it is considering proposing and obtain feedback on the likely impact the rule would have on these small entities.  5 U.S.C. § 609(b), (d)(2).  Moreover, when engaging in notice and comment rulemaking, the CFPB must also consult with other agencies, consider the costs and benefits of a proposed rule, publish a proposed rule that provides adequate notice of what the agency intends to do, provide the public with an opportunity to comment on the proposed rule, consider those public comments before the adoption of any final rule, and publish the final rule "not less than 30 days before its effective date."  *See* 12 U.S.C. § 5512(b)(1); 5 U.S.C. § 553.

48.     The CFPB undertook *none* of these steps.  It did not consult with small entities, including either small BNPL providers or small businesses that rely on BNPL to market their products, to determine whether the New Rule would adversely affect them.  It did not consult with other agencies or analyze the potential costs and benefits of the New Rule.  And it did not consider public comments before issuing the New Rule.  Indeed, the CFPB itself, when issuing the New Rule, said it was "not required … to collect comments."  89 Fed. Reg. at 47,068. Because the CFPB did not go through notice-and-comment procedures to promulgate the New Rule, it must be set aside.  5 U.S.C. § 706(2)(D).

***The New Rule Is Unlawful Because It Exceeds The CFPB's Statutory Authority Under TILA***

49.     The APA makes it unlawful to issue rules that are "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(C).  Those limits implement the fundamental principle "agencies may act only pursuant to authority delegated to them by Congress."  *Air All. Hous. v. EPA*, 906 F.3d 1049, 1060 (D.C. Cir. 2018). The New Rule violates these limits in at least three ways and each violation supplies an independent basis for setting aside the New Rule.

50.     First, the New Rule violates TILA to the extent it interprets the term "credit card" as including FTA members' BNPL products, which they are not.

51.     A "credit card" has a well understood meaning.  It encompasses the type of physical travel and entertainment credit card that Congress sought to regulate when it amended the definition of "creditor" in 1974.  *See supra* 6-7.  And while TILA contemplates that a "credit card" includes "other credit device[s] existing for the purpose of obtaining money, property, labor, or services on credit," 15 U.S.C. § 1602(*l*), that does not mean *any* device that can be used to obtain credit qualifies as such.

52.     To the contrary, before the authority over TILA was transferred to the CFPB, the FRB interpreted TILA—as amended by the Credit Card Act of 2009, Pub. L. No. 111-24, 123 Stat. 1734 (2009)—and recognized that the use of an "account number" to access "credit accounts" was insufficient for a device to constitute a "credit card."  Truth in Lending, 76 Fed. Reg. at 22,949.  That is because, as the FRB explained, "most if not all credit accounts can be accessed in some fashion by an account number," yet Congress clearly does not view all creditors as "card issuers."  *Id.* at 22,948, 22,949.

53.     It therefore had to be the case that Congress did not intend "to treat [all] account numbers that access a credit account as credit cards for purposes of TILA."  *Id.* at 22,949.  The FRB thus concluded that "an account number that [can] access[] a credit account is [only] a credit card … [if] the account number can access an *open-end* line of credit to purchase goods or services."  *Id.* at 22,949 (emphasis added).

54.     The New Rule exceeds the CFPB's statutory authority by seeking to define the term "credit card" in a manner that eviscerates the distinction Congress has drawn between credit cards and other credit products.

55.     Second, the New Rule violates TILA because TILA directs that any new disclosure obligation "shall have an effective date of that October 1 which follows by at least six months the date of promulgation," 15 U.S.C. § 1604(d), yet the New Rule's stated "effective date" was July 30, 2024, two months after it was promulgated. Truth in Lending (Regulation Z), 89 Fed. Reg. at 47,068.  TILA's delayed-effective-date provision applies not just to new disclosure requirements imposed by "regulation" but also to those imposed under an "interpretation."  15 U.S.C. § 1604(d).  So whether the New Rule can be properly considered an interpretive rule does not alter the conclusion that the CFPB acted beyond its statutory authority by requiring the provision of new disclosures in advance of October 1, 2025.

56.     Third, even if FTA's members who offer BNPL products could qualify as "card issuers" under TILA, the New Rule violates TILA because it purports to impose obligations beyond the limited set of obligations TILA contemplates for "card issuers" that provide credit that does not impose a finance charge and is not repayable in more than four installments.  *See* 15 U.S.C. § 1602(g) (permitting the CFPB to subject these card issuers to "the requirements imposed under part D of this subchapter [15 U.S.C. §§ 1666-1666j] and sections 1637(a)(5), 1637(a)(6), 1637(a)(7), 1637(b)(1), 1637(b)(2), 1637(b)(3), 1637(b)(8), and 1637(b)(10) of this title").

57.     Omitted from that limited set of obligations are obligations that make sense only for traditional, open-end credit cards that *do* impose finance charges and are repayable in more than four installments—for example, disclosures regarding the calculation of the finance charge and minimum payment warnings.  15 U.S.C. § 1637(a)(1)-(4), (b)(4)-(7), (9), (11).  By omitting these obligations in the list of obligations that may be extended to cards that do *not* impose a finance charge and are *not* repayable in more than four installments, Congress communicated

that these obligations are not extendable to such cards.  *Halverson v. Slater*, 129 F.3d 180, 185

(D.C. Cir. 1997) (explaining that the "mention of one thing implies the exclusion of another").

58.     Nevertheless, the New Rule purports to impose these very obligations on BNPL

providers.  The New Rule says that "lenders that issue digital user account[s] to access BNPL

credit are subject to the regulations appearing in subpart B of Regulation Z," which includes

disclosure obligations tethered to open-end credit cards that impose finance charges and are

repayable in more than four installments.  Truth in Lending (Regulation Z), 89 Fed. Reg. at

47,069.[6]  The New Rule thus exceeds the limited statutory authority Congress conferred to the

CFPB for regulating credit cards that do not carry finance charges and are payable in more than

four installments.  Because the New Rule defies Congress' statutory limitations, it must be

vacated.

### The New Rule Is Unlawful Because It Is Arbitrary And Capricious And An Abuse Of Discretion.

59.     Courts must "hold unlawful and set aside agency action, findings, and conclusions

found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

law."  5 U.S.C. § 706(2)(A).  An agency action is arbitrary and capricious when the agency does

not engage in "reasoned decisionmaking," *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm

Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), fails to "display awareness that it is changing

position," *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009), or fails to "provide

more substantial justification" for a change when its prior policy "has engendered serious

---

[6] While the FAQs purport to address these obligations, the FAQs are not an "official interpretation" of the CFPB, and therefore do not provide a safe harbor under TILA, 15 U.S.C. § 1640(f). *See* Policy Statement on Compliance Aids, 85 Fed. Reg. at 4579 ("Unlike the Bureau's regulations and official interpretations, Compliance Aids are not 'rules' under the Administrative Procedure Act.").

reliance interests that must be taken into account," *Encino Motorcars, LLC v. Navarro*,  579 U.S.

211, 222 (2016).  An agency action is an "abuse of discretion" when it is "based on an improper

understanding of the law."  *Statewide Bonding, Inc. v. DHS*, 422 F. Supp. 3d 35, 39 (D.D.C.

2019).  The New Rule must be set aside because it is both arbitrary and capricious, and an abuse

of discretion.

60.     ***The New Disclosure Obligations Are Ill-Fitted For BNPL Products***.  The New

Rule is arbitrary and capricious because it fails to consider how its new disclosure obligations are

ill-fitted for BNPL products, demonstrating that the CFPB fails to consider and address

important aspects of how BNPL products function on the ground.  *See Int'l Ladies' Garment

Workers' Union v. Donovan*, 722 F.2d 795, 824 (D.C. Cir. 1983) (failing to consider critical

differences between types of regulated activity renders a rule arbitrary and capricious).

61.     For example, the New Rule's requirement that BNPL providers issue periodic

statements to their customers is designed for credit cards and charge cards that allow customers

to make numerous purchases at different times during a billing cycle with payment due for the

collective amount on the same date irrespective of when the purchase occurred during the billing

cycle.  Regulation Z requires credit card issuers to send periodic statements "at least 14 days

prior to the date on which the required minimum periodic payment must be received," which is

feasible given the structure and terms of a credit card agreement.  12 C.F.R.

§ 1026.5(b)(2)(ii)(B)(2)(i).  But that requirement is infeasible for BNPL products.

62.     BNPL loans are issued as individual, closed-end loans.  Each BNPL loan typically

requires three equal payments in two-week increments after an initial 25% downpayment.  So

that means it is impossible to send periodic statements for all loans collectively at least 14 days

in advance of the next payment as required under Regulation Z.  By refusing to acknowledge that

BNPL providers cannot comply with Regulation Z's periodic-statement requirement, without changing the structure of BNPL loans, the New Rule raises more questions than it answers, creating uncertainty for FTA's BNPL-provider members, who are left to attempt to comply with the New Rule's insufficiently articulated requirements in inconsistent ways that will only confuse consumers.

63.     The FAQs suggest that BNPL providers can satisfy the periodic statement obligation either by treating each BNPL loan as a separate credit card account, and mailing periodic statements every two weeks, or by simply declining to "treat as late" payments that are not received upon the contractual due date (i.e., late payments).  The CFPB's attempt to explain how the periodic statement requirement applicable to actual "credit cards" would apply to BNPL loans only highlights how ill-fitting Regulation Z's regulatory regime is for BNPL loans—not a surprise given that the drafters of TILA and Regulation Z never contemplated that these provisions would apply to BNPL loans.  *See* Senate Report accompanying the Fair Credit and Charge Card Disclosure Act of 1988, S. Rep. No. 100-259, 1988 U.S.C.C.A.N. 3936, 3939 (1988) (describing a charge card as one that allows consumers to make purchases with a card and where "all charges are due and payable upon receipt of the periodic statement" and suggesting that the "American Express card" is typical of such cards).

64.     To start, the FAQs' suggestion that each loan could be treated as a separate credit card cannot be squared with Regulation Z's longstanding definition of "credit card," which makes clear that a credit card is something that can be "used from time to time."  12 C.F.R. § 1026.2(a)(15), cmt. 2(a)(15)-1.  Indeed, the New Rule itself acknowledges that a "credit card" must be "useable from time to time," an acknowledgement that cannot be reconciled with the

FAQs' suggestion that a "BNPL loan provider may treat each BNPL loan as a separate credit account."

65.    Likewise, the suggestion that BNPL providers can satisfy Regulation Z's periodic billing requirements by grouping BNPL loans together and simply declining to "treat as late" payments that are not received on the contractual due date, is an implicit acknowledgement that BNPL providers cannot comply with Regulation Z unless they change the very structure of their products.

66.    The CFPB's transparent attempt to jam the round peg of BNPL lending into the square hole of Regulation Z is a direct consequence of its decision to avoid the notice and comment rulemaking process that Congress mandates precisely to ensure that agencies engage in well-reasoned policymaking.

67.    ***Insufficient Compliance Time***.  In a similar vein, the CFPB failed to consider practical reality when it decided to make the New Rule "applicable as of July 30, 2024."  Truth in Lending (Regulation Z), 89 Fed. Reg. at 47,068.  It was unrealistic to expect that BNPL providers would be able to satisfy all of Regulation Z's now-applicable requirements that quickly and to expose BNPL providers to liability for failing to comply by that date.

68.    Regulation Z's requirements concerning billing error disputes and claims and defenses, for example, require a significant buildout of technology and processes.  If applicable, these provisions will require some of FTA's members to restructure their systems for interacting with its customers to provide compliant billing-error dispute resolution.  It was wholly unrealistic to think that they could complete this work by July 30, 2024, as the CFPB has subsequently acknowledged by suggesting that it would not seek to impose penalties on those seeking to comply with the New Rule.

69. ***Failure To Acknowledge Change In Position***.  The CFPB's failure to acknowledge that the New Rule is a departure from the CFPB's past position also makes the New Rule arbitrary and capricious.  The CFPB maintains that it is merely "clarify[ing] *existing* obligations" through the New Rule.  89 Fed. Reg. at 47,069 (emphasis added).  But as FTA has explained, *supra* 9-11, the New Rule departs from the CFPB's longstanding view of who is subject to subpart B of Regulation Z, and it purports to impose brand new obligations on BNPL providers.  The CFPB's failure to acknowledge that it is changing its position shows that it has acted in an arbitrary and capricious manner.

70. ***Reliance Interests***.  The Supreme Court has held that it is arbitrary and capricious when an agency reverses course and fails to "provide more substantial justification" when "its prior policy has engendered serious reliance interests that must be taken into account."  *Perez*, 575 U.S. at 106.  The CFPB has failed to provide such a justification despite the serious reliance interests its preexisting policy on BNPL products fostered.

71. For years, the CFPB has repeatedly suggested that Regulation Z does not apply to BNPL products, *see supra* 9-11.  FTA's members have developed their BNPL products in reliance on the Official Commentary and the CFPB's representations about its legal obligations. They have spent significant amounts of money, time, and employee resources to develop their BNPL products with the understanding that they are not subject to Regulation Z.  Now FTA's members must abruptly change course and refashion their products, disclosures, billing systems, and customer service apparatuses to comply with the New Rule.

72. Despite the serious reliance interests the CFPB's old policy generated, the CFPB has not offered anything close to a substantial justification for the New Rule's about-face.  To the contrary, the CFPB maintains that the New Rule is no change in policy at all.  The CFPB's

failure to acknowledge how its change in policy disrupts serious reliance interests renders the New Rule arbitrary and capricious.

73.    ***Improper Understanding Of The Law***.  The New Rule is also an "abuse of discretion" because it is "based on an improper understanding of the law."  *Statewide Bonding*, 422 F. Supp. 3d at 39.  BNPL providers are not "creditors" because they do not issue "credit cards" as defined by the Official Commentary.  *See supra* 9-10.  By concluding otherwise, the CFPB misunderstands and misapplies the law.

## CLAIMS FOR RELIEF

## COUNT I

### Violation of the APA: Notice and Comment

### 5 U.S.C. § 706(2)(D)

74.    FTA repeats and incorporates all previous allegations.

75.    The New Rule must be set aside because it was issued "without observance of procedure required by law."  5 U.S.C. § 706(2)(D).

76.    The New Rule purports to amend the Official Commentary, which was promulgated through notice and comment, without going through notice and comment.  That violates one of the bedrock principles of administrative law: that an agency must "use the same procedures when they amend … a rule as they used to issue the rule in the first instance."  *Perez*, 575 U.S. at 101.

77.    The New Rule must therefore be held unlawful and set aside.

## COUNT II

### Violation of the APA and TILA: Notice and Comment

### 5 U.S.C. § 706(2)(D) & 15 U.S.C. § 1602(g)

78.     FTA repeats and incorporates all previous allegations.

79.     The New Rule must be set aside because it was issued "without observance of procedure required by law."  5 U.S.C. § 706(2)(D).

80.     The New Rule violates TILA's requirement that the CFPB proceed through notice-and-comment rulemaking before extending obligations to card issuers who do not impose a finance charge or require repayment in more than four installments.

81.     TILA contemplates that creditors include "card issuers whether or not the amount due is payable by agreement in more than four installments or the payment of a finance charge is or may be required" and that those card issuers may therefore be subject to a subset of TILA provisions.  15 U.S.C. § 1602(g).  But it only contemplates that these "card issuers" may be subject to those TILA provisions, "to the extent appropriate," if the CFPB proceeds "*by regulation*."  15 U.S.C. § 1602(g) (emphasis added).

82.     The "by regulation" language required the CFPB to proceed via notice and comment when enacting the New Rule.

83.     Because the CFPB evaded that requirement when it issued the New Rule, the New Rule must be held unlawful and set aside.

## COUNT III

### Violation of the APA: Exceeds Statutory Authority

### 5 U.S.C. § 706(2)(C)

84.     FTA repeats and incorporates all previous allegations.

85.     The APA requires a reviewing court to "hold unlawful and set aside agency action … found to be … in excess of statutory jurisdiction, authority, or limitations."  5 U.S.C. § 706(2)(C).

86.     The New Rule exceeds the CFPB's statutory authority because it eviscerates the distinctions Congress has drawn between credit cards and other financial products.

87.     A "credit card" has a well understood meaning.  It encompasses the type of physical travel and entertainment credit card that Congress sought to regulate when it amended the definition of "creditor" in 1974.  *See supra* 9-11.  And while TILA contemplates that a "credit card" includes "other credit device[s] existing for the purpose of obtaining money, property, labor, or services on credit," 15 U.S.C. § 1602(l), that does not mean any device that can be used to obtain credit qualifies as such.

88.     To the contrary, before the authority over TILA was transferred to the CFPB, the FRB interpreted TILA—as amended by the Credit CARD Act of 2009, Pub. L. No. 111-24, 123 Stat. 1734 (2009)—and recognized that the use of an "account number" to access "credit accounts" was insufficient for a device to constitute a "credit card."  Truth in Lending, 76 Fed. Reg. at 22,949.  That is because, as the FRB explained, "most if not all credit accounts can be accessed in some fashion by an account number," yet Congress clearly does not view all creditors as "card issuers."  *Id.* at 22,948, 22,949.

89.     It therefore had to be the case that Congress did not intend "to treat [all] account numbers that access a credit account as credit cards for purposes of TILA." *Id*. at 22,949.  The FRB thus concluded that "an account number that [can] access[] a credit account is [only] a credit card … [if] the account number can access an *open-end* line of credit to purchase goods or services."  *Id.* at 22,949 (emphasis added).

90.     Because the New Rule eviscerates the distinctions Congress has drawn between credit cards and other financial products, it exceeds the CFPB's statutory authority, and it must be held unlawful and set aside.

## COUNT IV

### Violation of the APA: Exceeds Statutory Authority

### 5 U.S.C. § 706(2)(C)

91.     FTA repeats and incorporates all previous allegations.

92.     The APA requires a reviewing court to "hold unlawful and set aside agency action … found to be … in excess of statutory jurisdiction, authority, or limitations."  5 U.S.C. § 706(2)(C).

93.     The New Rule exceeds the CFPB's statutory authority because TILA directs that any new disclosure obligation "shall have an effective date of that October 1 which follows by at least six months the date of promulgation," 15 U.S.C. § 1604(d), and the New Rule purports to be applicable as of July 30, 2024, Truth in Lending (Regulation Z), 89 Fed. Reg. at 47,068.

94.     TILA's delayed-effective-date provision applies not just to new requirements imposed by "regulation" but also obligations imposed under an "interpretation."  15 U.S.C. § 1604(d).

95.     By setting July 30, 2024, as the effective date for the New Rule, the CFPB acted beyond its statutory authority.

96.     Because the New Rule exceeds the CFPB's statutory authority, it must be held unlawful and set aside.

## COUNT V

### Violation of the APA: Exceeds Statutory Authority

### 5 U.S.C. § 706(2)(C)

97.     FTA repeats and incorporates all previous allegations.

98.     The New Rule also exceeds the limited statutory authority Congress conferred to the CFPB for regulating products that do not carry finance charges and are payable in more than four installments.

99.     TILA contemplates a limited set of obligations that the CFPB may extend to "card issuers" that provide credit that does not impose a finance charge and is not repayable in more than four installments.  *See* 15 U.S.C. § 1602(g) (permitting the CFPB to subject certain "card issuers" to "the requirements imposed under part D of this subchapter [15 U.S.C. §§ 1666-1666j] and sections 1637(a)(5), 1637(a)(6), 1637(a)(7), 1637(b)(1), 1637(b)(2), 1637(b)(3), 1637(b)(8), and 1637(b)(10) of this title").

100.     The New Rule violates TILA by imposing obligations on BNPL providers that TILA does not contemplate can be extended to them, even assuming they could be considered "card issuers."  Truth in Lending (Regulation Z), 89 Fed. Reg. at 47,069.  The New Rule says that "lenders that issue digital user account[s] to access BNPL credit are subject to the regulations appearing in subpart B of Regulation Z," which includes disclosure obligations tethered to open-end credit cards that impose finance charges and are repayable in more than four installments.  *Id.*

101.     Because the New Rule exceeds the CFPB's statutory authority, it must be held unlawful and set aside.

## COUNT VI

## Violation of the APA: Arbitrary and Capricious

## 5 U.S.C. § 706(2)(A)

102.     FTA repeats and incorporates all previous allegations.

103.    The New Rule is arbitrary and capricious.  5 U.S.C. § 706(2)(A).

104.    The New Rule is arbitrary and capricious because the CFPB overlooked that certain obligations the New Rule imposes are a poor fit for BNPL loans.  For example, the New Rule requires that BNPL providers issue periodic statements to their customers, a TILA requirement designed for credit cards and charge cards that allow customers to make numerous purchases at different times during a billing cycle with payment due for the collective amounts on the same date irrespective of when the purchase occurred during the billing cycle.  BNPL providers cannot comply with this requirement without changing the very nature of their BNPL loans.

105.    The New Rule is also arbitrary and capricious because the CFPB overlooked that the New Rule grants insufficient time for FTA's members to come into compliance with their new obligations.

106.    Finally, the New Rule is also arbitrary and capricious because the CFPB failed to acknowledge that the New Rule constitutes a change in policy and because the CFPB failed to consider the serious reliance interests that its prior policy on BNPL loans had engendered.

107.    Because the New Rule is arbitrary and capricious, it must be held unlawful and set aside.

## COUNT VII

### Violation of the APA: Abuse of Discretion

### 5 U.S.C. § 706(2)(A)

108.    FTA repeats and incorporates all previous allegations.

109.    The New Rule is an abuse of discretion because it is based on an improper understanding of the law.  5 U.S.C. § 706(2)(A); *Statewide Bonding*, 422 F. Supp. 3d at 39.

110.     BNPL providers are not "creditors" because they do not issue "credit cards" as defined by the Official Commentary.

111.     The New Rule depends on an improper understanding of the Official Commentary.

112.     Under the Official Commentary, the only "card issuers" subject to TILA despite not imposing a finance charge or requiring repayment in more than four installments are "the issuers of so-called travel and entertainment cards that expect repayment at the first billing and do not impose a finance charge."  12 C.F.R. pt. 1026, cmt. 2(a)(17)(iii)-1.  BNPL products are not travel or entertainment cards.

113.     In addition, the Official Commentary generally rejects the notion that an "account number" not associated with a physical card can nonetheless constitute a "credit card" under TILA.  The Official Commentary concluded that only certain "account numbers that [can] access a credit account [are] credit cards for purposes of TILA": those that "can access an open-end line of credit to purchase goods or services."  Truth in Lending, 76 Fed. Reg. at 22,948, 22,949, 23,005 (emphasis added).  That conclusion is codified in Regulation Z.  12 C.F.R. pt. 1026, cmt. 2(a)(15)-2(ii)(C).  BNPL products do not provide an open-end line of credit.

114.     By stating that it is merely "clarify[ing] existing obligations," Truth in Lending (Regulation Z), 89 Fed. Reg. at 47,069, the New Rule confirms that it misunderstands the Official Commentary.

115.     Because the New Rule is based on a misunderstanding of the law, it must be held unlawful and set aside.

**PRAYER FOR RELIEF**

FTA requests that the Court grant the following relief:

a. Declare the New Rule arbitrary, capricious, an abuse of discretion, without observance of procedure required by law, and otherwise not in accordance with the law within the meaning of 5 U.S.C. § 706(2)(A) and promulgated in excess of statutory jurisdiction, authority, or limitations within the meaning of 5 U.S.C. § 706(2)(C);

b. Vacate the New Rule and enjoin the CFPB and all of its officers, employees, and agents from implementing, applying, or enforcing the New Rule;

c. Enjoin the CFPB and all of its officers, employees, and agents from implementing, applying, or enforcing the New Rule against FTA's members;

d. Award FTA its costs and reasonable attorney's fees as appropriate; and

e. Grant such other relief as the Court deems necessary, just, and proper.

Dated: October 18, 2024

ORRICK, HERRINGTON & SUTCLIFFE LLP


By: */s/ Walter E. Zalenski*

Walter E. Zalenski, D.C. Bar No. 395205
John R. Coleman, D.C. Bar No. 90002867 (*pro hac vice* motion forthcoming)
ORRICK, HERRINGTON
    & SUTCLIFFE LLP
2100 Pennsylvania Avenue, NW
Washington, DC  20037-3202
(202) 339-8400
wzalenski@orrick.com
jrcoleman@orrick.com

Nicholas González (*pro hac vice* motion forthcoming)
ORRICK, HERRINGTON
    & SUTCLIFFE LLP
355 S. Grand Avenue, Suite 2700
Los Angeles, CA  90071
(213) 629-2020
ngonzalez@orrick.com

Attorneys for Plaintiff
Financial Technology Association